Filed 6/9/21  In re G.R. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re G.R. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>M.R. et al.,<br><br>    Defendants and Respondents;<br><br>G.R., a Minor, etc., et al.,<br><br>    Appellants. | G059563, G059711, G059831<br><br>(Super. Ct. Nos. 19DP0997, 19DP0999, 19DP1000)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Appellants.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Respondent M.R.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Respondent K.R.

\*       \*       \*

This is a consolidated appeal by the minors, G.R., S.R., and A.R. (the minors), from two juvenile court orders denying their petitions pursuant to Welfare and Institutions Code[1] section 388.[2] The minors argue there was overwhelming evidence that they should have been removed from the father's custody and that they continue to be in danger. The mother, K.R., joins the minors' arguments while the father, M.R., and the Orange County Social Services Agency (SSA) argue the court did not err. With respect to the first section 388 petition, we find the court reasonably and within the statutory framework set out by dependency law exercised its discretion to resolve the pertinent issues without the drastic step of removing the minors from the father's custody. With regard to the second section 388 petition, we find the court did not err in determining there was not sufficient evidence to support the petition. Accordingly, we find no abuse of discretion and affirm the orders.

---

[1] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The minors also appeal from an order at the six-month review hearing which maintained the status quo and left S.R., G.R., and A.R. in split 50/50 custody between their mother and father. They acknowledge this is a "protective appeal" only, to avoid waiver or forfeiture. They offer no legal argument as to this order.

2

I

FACTS

*Background and Detention*

After a lengthy relationship, the parents were married for 18 years. They had four children, H.R., G.R., S.R., and A.R. [3] They separated in 2014 and a protracted and acrimonious dissolution proceeding followed. In July 2016, the family court entered a judgment of dissolution. As of 2018, the parents had 50/50 physical custody. The mother had not worked outside the home for many years, but she obtained a phlebotomy license and was looking for work. The father was a licensed attorney and a shareholder at a law firm.

On August 22, 2019, SSA filed a dependency petition alleging jurisdiction under section 300, subdivisions (b) and (c), failure to protect and serious emotional damage. The petition is quite lengthy, but in sum it alleged the children had displayed symptoms of serious emotional harm as a result of their parents' "conflictual and antagonistic behavior toward each other," with each parent attributing the children's issues to the other parent. SSA alleged the parents were unable to communicate effectively, as evidenced by their messages to each other and to SSA, in which each parent repeatedly asserted what they believed the other parent was doing wrong.

The children had been in therapy intermittently pursuant to a family court order. Their therapist was Kristin Parker, a licensed marriage and family therapist.

H.R., who was age 11 at the time, had been diagnosed with moderate major depression with symptoms that included suicidal ideation. When H.R. tried to discuss an issue with her father during a therapy session, Parker noted the father had a flat affect, lacked empathy, and denied the child's perspective. Parker referred H.R. to a psychiatrist who diagnosed H.R. with anxiety, mild depression, and adjustment disorder with

---

[3] While the appeal directly concerns G.R., S.R., and A.R., we include some facts about H.R. to provide a more complete picture of the case.

3

emotional features. The psychiatrist prescribed medication. The father subsequently discontinued therapy and H.R.'s medication. Another opinion was sought, and this third doctor, Brian Bello, recommended H.R. resume therapy with Parker, although he did not recommend medication at the time.

H.R. reported being "stressed when she has to go to the father's home and that she had thoughts of suicide because she could not handle it. The child reported that the father yells a lot, is not nice to the stepmother, that he will not listen to her, and that he denies doing anything that causes her to feel the way she does. The child reported that she was doing better after therapy and medication, and that the father would not allow her to continue these things, and she was feeling anxious again, crying all the time, and did not want to be at his house." On August 15, 2019, H.R. was "observed crying, rocking back and forth, h breaths, holding her knees to her chest, and pulling her hair due to not wanting to go to the father's home." The following day, she was taken to the emergency room and found to be having a "major panic attack" regarding seeing the father. She expressed suicidal ideation, stated she wished her father was dead, and that she would run away if forced to go to her father's home.

G.R., who was H.R.'s twin and therefore also age 11, was diagnosed with mild major depression. He had irritability, concentration issues at school, psychomotor agitation and anger, a sad mood, and avoidance of activities. He had difficulty with anger management and used avoidance as a coping skill. He reported the father yelled and refused to have a therapy session with him.

S.R., age 9, also had mild major depression. His symptoms included tearfulness, a sad mood, reduced interest in activities, low self-esteem, and difficulty concentrating at times. He reported not feeling believed when he expressed himself and had stopped participating in activities he used to enjoy because his self-esteem had diminished.

A.R., age 8, was diagnosed with major depression single episode, mild. Her symptoms included difficult concentrating and focusing, limited attention to details, forgetfulness, sadness, low self-esteem, and irritability. She did not want to visit the father at his home because she did not like his yelling and felt that she frequently got into trouble there. Parker had recommended a formal evaluation by the school district regarding the possibility of an individualized education plan (IEP) to help her with schoolwork and low self-esteem.

The petition alleged that the father had failed to ensure appropriate treatment for the children's mental health and emotional needs. He lacked insight into how his conduct was contributing to the children's issues. The children's therapist, Parker, reported all the children had expressed they did not want to go to their father's home, but each had a different way of dealing with their stress. Bello opined that based on H.R.'s statements, there appeared to be "mild emotional abuse" going on at the father's house. The father's behavior was affecting H.R., and if his behavior changed, her anxiety and depression would resolve. Bello recommended the father take parenting classes, and needed to be open to the idea that there are things he needed to work on. Moreover, the father allegedly had undiagnosed anger management issues and an unresolved substance abuse problem with alcohol.

While the mother was cooperative with treatment and services for the children, she lacked insight into how her own behavior was contributing to their problems. She also had her own ongoing mental health issues. An evaluation under Family Code section 730 during the family law case had reported the mother had an "enmeshed co-dependent relationship with the children." Among other things, the petition alleged she had destroyed gifts to the children from the stepmother and showed H.R. selected text messages between the parents in an effort to alienate the father.

5

The detention report noted previous contacts between the family and SSA dating back to 2015 that were determined to be inconclusive or unfounded. Neither parent had a criminal history.

SSA recommended H.R. remain in the care of the mother, under SSA's supervision, and that G.R., S.R., and A.R. remain in the care of both parents, also under SSA's supervision.

Both parents denied the petition's allegations. At the continued detention hearing on August 23, the court ordered H.R. detained from the father and for the children to participate in therapy. With respect to the father's alleged alcohol abuse problem, the court authorized SCRAM[4] testing if needed.

*Jurisdiction/Disposition*

H.R. had been interviewed by the social worker during the preparation of the detention report. At that time, she reported that while her mother disciplines by timeouts and talking, her father disciplines by "yelling and screaming." She was not currently taking any medications because her "father said I can't," nor was she allowed to go to therapy. H.R. reported that her father gets drunk, including one occasion where she was frightened because he passed out on the couch. She did not feel safe living with her father. Because she did not see her therapist or take her medication, she felt anxious, cried all the time, and did not want to be at her father's house. H.R. said a 10-day vacation was scheduled with her father and she did not want to go. She denied suicidal ideation.

---

[4] SCRAM is an acronym for Secure Continuous Remote Alcohol Monitor. (*Mogg v. State* 918 N.E.2d 750, 752 (Ind. Ct.App. 2009).) The device, which is a bracelet worn on the ankle or lower leg, "measures concentrations of transdermal alcohol, that is, alcohol perspired through a person's skin as sweat or vapor" every 30 minutes, using technology similar to breathalyzer devices. (*Id.* at p. 753; see also *People v. International Fidelity Ins. Co.* (2017) 11 Cal.App.5th 456, 459.)

6

In a later interview, H.R. repeated that her father was short-tempered and drank to the point where he passed out. In addition to yelling "non-stop" the father belittled the stepmother. After their failed attempted at conjoint therapy, she never wanted to see her father again. Since being in the care of her mother, she felt much better. She reported disturbing incidents where the father would drive by the mother's home during his custody time and deliberately acted to stop the mother from participating in a school event with the children. She believed her father "'needed to change everything.'" She also said she would like to return to therapy with her previous counselor, Kristen Parker.

G.R. was also interviewed for the jurisdiction/disposition report. The social worker met privately with G.R. with the door closed, but he whispered throughout the interview. When the social worker asked why, he said: "My dad has a temper. He starts to yell at us and gets really mad at us for no reason. Sometimes he's just in a really bad mood. . . . I'm scared living here. Like right now, I'd rather not be here and I know he's going to question me when you leave and I'm scared." While the mother would talk to them if she was upset, the father yelled and would scare them.

G.R. reported he had seen the father drink vodka at dinner and appeared to be "out of it" on occasion. He reported an incident where S.R. was forced to eat dinner in the garage. He was scared living with the father because of his angry yelling. G.R. stated he would be happy to begin counseling again with Kristin Parker.

S.R. also reported yelling by the father and an occasion where the father slapped a game controller out of his hand, which made him nervous, and he started to cry. He was scared because he was not sure if his father was going to do anything else. He saw the father drink alcohol two to three times a day. He also recounted the incident where the father made him eat his dinner alone in the garage, which he said occurred because he and G.R. were laughing and could not stop. S.R. as well as others reported an

7

incident where the father told him he would never be good enough to move up to the next league in children's baseball, and he had not played baseball since.

If S.R. had a choice, he would not come to the father's house again because he was scared. He also wanted to continue counseling with Parker. He said the father was "not a nice person, angry all the time, and unpredictable." If he could, he would change "everything about him."

A.R. told the social worker that her father had asked her what she had told the emergency social worker who interviewed them prior to the detention hearing. She did not tell him anything because her mother had told her she was not to discuss the case with the parents. She did not want her father to find out what she told the current social worker.

A.R. reported she did not feel safe at the father's home because "'sometimes at night he acts weird and says nonsense words and kind of scares me.'" She said her father is "really mean" and feels safe when her stepmother comes home, but not when she is alone with the father. He yelled and slammed doors all day and "'acts crazy.'" She knew what alcohol was and shared that her father drinks alcohol a lot.

A.R. enjoyed counseling because her counselor was really nice, and she had been going to counseling since her parents divorced. Her father would text "'mean things'" that would make her mother "sad." She wanted her father to stop being mean to her mother, her, and her siblings.

As for the parents, each blamed the other for the situation and their failures to coparent the children. The father also blamed the children's counselor and rejected the mental health diagnoses, stating, for example, that he had done research on H.R.'s medication and decided she should not be taking it. In denying the petition's allegations, he stated the mother "is causing all of this."

The father believed the children had "age-appropriate behavioral issues." He admitted he yelled at the children frequently but did not believe he "yelled more than

8

the ordinary parent." He denied the incident (reported by H.R., G.R., and S.R.) about S.R. being forced to eat dinner alone in the garage. The father denied any unresolved substance abuse or anger management issues. He accused the mother of abusing the children through parental alienation, and accused Parker of being biased. He also sent the social worker a link to an article about "good intentioned, but inadequately trained therapists," when it came to parental alienation. The father stated Parker "simply lacks the training to understand this level of pathology and has made the problem much worse."

The social worker contacted the paternal grandmother, who reported that since the divorce she and her husband had not had much of a relationship with the father. The father had been caught in numerous lies, including one about an affair that led to the divorce. She had noticed the children's comments about the father's anger progressing. She did not understand the father's anger toward the mother, as it was the father who wanted the divorce. The father later claimed his mother was being extorted by the mother into her comments under threat of not seeing the children. The paternal grandmother denied this.

The stepmother also spoke to the social worker. While she believed the children were comfortable in the father's care, including H.R., she acknowledged the children did not like it when the father yells at them. She said the father would raise his voice when the children were not listening or were fighting between themselves. She acknowledged alcohol use of one to two drinks a day during the week, but denied the father becomes drunk or passes out.

SSA's report ultimately recommended family maintenance services for the mother and additional services for the father.

An addendum report indicated that Parker, the children's therapist, opined the father played a role in the children's anxiety and depression. She reported the father's conduct to be "'intense'" and "angry" in his comments to the children. The children also

reported the father would commonly make disparaging comments about the mother. He was unwilling to accept any responsibility for the children's feelings. The mother also reported that the father was "video taping the kids when they are in trouble telling them to say why they are in trouble and he video taped them on campus on Friday when he felt it took them too long to come to him after school bell."

The jurisdictional hearing was continued numerous times, and the father filed several motions, including one to remove Parker as therapist and one to dismiss the case entirely. At one of the hearings where the case was ultimately continued, the court ordered "the father not to video record the minor[s] without their consent."

Interim reports stated the father was taking parenting and anger management classes. G.R. stated visits at the father's house had been "okay." At one point, the father told A.R. that "'[H.R.] is going to come back.'" The mother reported the father continued to refuse to coparent with her. The children reported the father drinking alcohol, but the father denied he had used alcohol at all, and told the social worker it was "'contrived and made up,'" the children were "'[t]rying to align with their mother,'" and this behavior was "'[a]lienation.'"

Repeatedly, from his first meeting with the social worker to the jurisdictional hearing almost a year later, the father complained of parental alienation and offered his own mental health diagnoses as to the mother and the children, sometimes in great detail. He sent the social worker "a 26-page report 'Recommended Treatment-Related Assessment Protocol for Parent-Child Attachment Pathology Surrounding Divorce' and a 19-page report 'Essays on Attachment-Based Parental Alienation.'" He was alternately demanding and conciliatory with social workers. The history of his communications with the mother, however, were consistently angry, dismissive, and sometimes profane.

10

The hearing proceeded on June 1, 2020. The father withdrew his motion to dismiss. The father entered a nolo plea and the mother submitted on the petition as amended.

The court sustained the petition on both counts with respect to H.R. (§ 300, subds. (b) & (c)), and on the failure to protect count only (§ 300, subd. (b)) as to G.R., S.R., and A.R. The court declared all of the children to be dependents. Custody, under the supervision of social services, remained status quo, with H.R. with the mother and the other three children with both parents. The court also ordered that neither parent was to make disparaging remarks about the other parent to the children or within earshot. The court denied the father's petition to dismiss Parker, but selected a different therapist for conjoint therapy between H.R. and the father.

*July 2020 Section 388 Petition*

On July 7, 2020, a section 388 petition was filed on behalf of G.R., S.R., and A.R., asking the court to remove them from their father's custody. The petition alleged that in contravention of the court's prior order, the father was found to be recording teletherapy sessions with Parker.[5] The petition stated: "The children have previously expressed concerns regarding the [f]ather recording them, and potentially recording their therapy sessions and have expressed great distress related to [f]ather's conduct. [The children] have also expressed discomfort when [f]ather confronts them about things they believed he would only know if he had recorded them."

The petition included a letter from Parker stating that during his session, S.R. had discovered a red light on the keyboard with a stop button next to it. After pushing stop, a video played of the beginning of their session that day, starting before S.R. had entered the room. S.R. began whispering that he was afraid and did not know

---

[5] Given the date, we presume teletherapy was being used due to the COVID-19 pandemic.

11

what to do.  After his session, S.R. relayed the information to G.R., who was "visibly shaken and said he was scared."  Parker and the minors spent most of the session discussing and processing this.  Parker did not know if previous sessions had been recorded.[6]

The court ordered a hearing on the motion, prior to which the father was ordered "not to change, delete or modify in any way the hard drive(s) on any device(s) used by the minors in therapy sessions with Ms. Parker. Father is not to delete any audio/video recorded files on any of these devices."

An interim report by SSA reflected interviews with the family.  The mother stated that the father "continues to get away with not following court orders and that [G.R., S.R., and A.R.] are scared of being at their father's home visiting."  The minors' anxiety increased prior to their visits with the father.  With regard to the therapy sessions, she believed the father would erase any recordings.

When the mother e-mailed the father about paying his share of H.R.'s counseling bill, the father said no, stating that the mother "'alone [is] responsible for the abuse of our children.'"

Regarding the children, H.R., who by then was age 12, reported she was doing well and had no desire to have contact with her father.  G.R., also age 12, stated he felt "'intimidated,'" "'uncomfortable,'" and sometimes "'scared'" at his father's home.  He stated his father gets drunk often.  S.R., age 10, did not like visiting his father.  He described the incident regarding the recorded therapy session, and felt uncomfortable that therapy was "'not private.'"  He also reported being "'scared'" of his father, because "he is always questioning and bringing up court matters."  A.R., who had turned 9, also disliked visiting her father, and was "scared" of him.  She was also aware of the

---

[6] This information is included for explanatory purposes.  The court later struck the letter for lack of foundation and did not consider it in ruling on the petition.

recording incident. A.R. told the social worker that her father "'drinks and gets drunk'" but not to the point of falling over.

During a call with the father, he told the social worker that he preferred communicating in writing. He stated he had not recorded the minors' therapy session and had nothing further to say on the matter, commenting, "'[t]hese are only allegations against him.'"

SSA assessed the situation as follows: "While the children express not wanting to go to their father's home or stating feeling uncomfortable around him, there have been no reports of physical abuse or neglect reported by the children toward their father. [¶] Based on the above concerns as well as overall safety assessment, it is recommended that the children continue in the care of the parents under joint custody and that the children's counseling/therapy be conducted in-office."

The hearing on the motion was trailed and continued several times. SSA filed an addendum report prior to the hearing. This report primarily consisted of a letter from the therapist working with the parents and H.R., Dr. Sue Tonkins, who asked that therapy between H.R. and the father be expanded to intensive therapy. Tonkins reported that in a session with H.R. and the father, "[H.R.] was able to listen to father take accountability for his actions and apologize in detail for hurting [H.R.] and her siblings." The letter stated: "Generally, father must be more attuned to his children's needs and have regulated communication devoid of screaming, criticism, ridicule, and over-control. Additionally, given statements that Father has passed out due to excessive alcohol use this therapist has requested that the father not drink while in the presence of the minor children."

The hearing on the July section 388 petition took place in October 2020. S.R. testified first, and stated he was nervous his father would punish him for doing so. His testimony essentially mirrored what had been reported by SSA – that he was scared of going to his father's house and that his father had been drunk multiple times. He was

13

frequently scared at his father's home – nearly every time he was there.  Although he thought his father loved him and his siblings, he did not know what behavior would set his father off.

S.R. also testified as to the incident regarding the recorded therapy session. He saw the red button on the screen during his session, and thought it look like something he saw on his phone when he was making a video.  When he pressed the button, a video appeared on the screen with his father's back to the camera.  S.R. said that it was "like a regular video, but it was a recording of the laptop."  The video was of that day, and "it was just a recording of the screen the entire time."  When asked if he had given permission for his father to record his therapy session, S.R. replied: "No, never."

S.R. testified that when he saw the recording, he thought:  "Why are you doing this?  This is supposed to be private and something you're not supposed to be looking at, listening to."  He said "[i]t made me feel sad, not scared, but sad, because . . . that's a private time.  And since our dad is a lawyer, I feel like he knows enough of that, like, when not to do that."  He talked to Parker about things he did not want his father to know.

The next morning, when S.R. and G.R. were present, the father told them that "one of you guys touched the laptop last night when you were talking to [Parker]." He was scared his father may also have recorded other sessions with Parker.

S.R. testified his father had also said on multiple occasions that H.R. would be home soon, which scared S.R. because he knew H.R. hated it at their father's house. "We all do because we're scared.  And when he said that, it makes me feel like [H.R.] is going to suffer again, or – because she got taken out of his custody for a reason, and I don't want her to have to suffer again."  When asked what he wanted the court to know about his request, he said:  "I just don't want to go there.  That's it."

G.R. also testified, saying he, too, was nervous because he was scared about what his father would do if they have to go back to his house, because he was

14

testifying against living with him. He said his father "has a big temper. . . . [H]e's gotten drunk multiple times in front of us, which is scary. Because when he gets drunk, he gets mad sometimes." When his father was mad, "he'll raise his voice a lot and get . . . super loud, and he'll direct it at all of us if we made him mad or just one of us, which is super scary when he . . . yells at us." When his father was drunk, G.R. testified, he acted differently, speaking more slowly and staying focused on the person with whom he was speaking.

With respect to S.R. informing G.R. about the recording of the therapy session, G.R. stated it caused him stress, and he did not want his father to know S.R. had stopped the recording. He was upset his father would record them talking to Parker during their time with her. He has also heard his father say H.R. would be coming home soon, and he is worried about H.R. if she has to return to the father's house. G.R. said he wanted the court to know that for the last six or seven years, every time he goes to the father's house he is "so stressed out."

H.R. also testified, stating, as relevant here, that S.R. was "stressed out and scared" at her father's house and did not want to go there. G.R. has expressed to her that he is "scared" that the father would yell, and he felt lonely there. A.R. did not want to go to her father's house for the same reasons.

After H.R.'s testimony,[7] the father's counsel made a motion under section 350, subdivision (c), arguing the minors had not met their burden with respect to a section 388 petition, which the court denied.

The social worker also testified, stating, among other things, that SSA was concerned about the father's drinking, but not with respect to abuse or neglect of the minors. The social worker was aware of the minors' feelings with respect to visiting their father and the reasons for it, but felt the solution was for the father to address that in

---

[7] A.R. also testified, but her testimony was stricken because she refused to continue following a break.

15

counseling, which he was not doing at that time. The social worker had not, at that point, visited with the minors while they were at the father's home. The social worker felt it would be a "good idea" to test the father for alcohol use.

The court heard argument from counsel and took the matter under submission, issuing its ruling on October 14. The court reviewed section 361, subdivision (c)(3), which it designated as the statute most relevant to the petition. That subdivision is relevant in situations where the a minor is "suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent . . . ." (§ 361, subd. (c)(3).)

With respect to a change of circumstance, the court found sufficient evidence that the father intentionally recorded the therapy session between S.R. and Parker without permission, satisfying the first prong of section 388. The court noted: "this is not the first incident involving [the] father's unauthorized recording of the children . . . there were allegations that [the] father was recording [the] children in general without their permission and as reflected on the minute order for the November 5, 2019 hearing, the court specifically ordered [the] father not to video record the minors without their consent. That order was continued at every hearing subsequent to that, when the court indicated that all prior orders were to remain."

The court continued: "[The] [f]ather has made no secret about the fact that he doesn't like Miss Parker. He doesn't trust her sessions with the minors and he has repeatedly attempted throughout this case to get access to information shared in those sessions. It does appear to the court that despite the court's previous orders, that, for whatever reason, [the father] could not control his need to know what was being said and taped, at a minimum, [S.R.'s] session."

16

"I cannot stress enough," the court went on, "how serious of a violation this is. This communication involved not only private and sensitive, but privileged information and communication under California law. And I cannot put it any better than [S.R.] did during testimony: His father is a lawyer and he should know better. [¶] The court believes that [the] father, actually, does know better. [The] [f]ather knows that these sessions and their right to keep them private is extremely important to the children. They have made that clear and it's . . . understandable. I believe that [the] father just decided that his need to know what was going on in those sessions was more important than the children's right to keep those conversations private."

The court continued: "I am floored that [the father], an attorney with years of experience, would disregard not only my order, but also the California Evidence Code as it relates to psychotherapist/patient privileged communications. [¶] And if that isn't enough, I should also point out that this conduct very possibly violates section 632 of the California Penal Code, which makes eavesdropping and recording of private communications . . . punishable [by fine and incarceration]. . . . [¶] I am extremely concerned that father would risk, first of all and probably most important, his relationship with his children, his freedom and very possibly, his livelihood since a conviction for a violation for [violating Penal Code] section 632 probably involves what the State Bar would consider moral turpitude, just in order to know what it was his children are saying about him with their therapist. [¶] This is a serious violation of the children's privacy. So the first prong has been established."

As to the second prong, which concerned whether removal from the father promoted the best interests of the children, the court noted it was required to analyze whether there was clear and convincing evidence of grounds for removal under section 361, subdivision (c). Accordingly, the court had to examine whether the children were suffering from severe emotional damage, as evidenced by anxiety, depression, withdrawal or aggressive behavior. The court stated that there was clear and convincing

17

evidence G.R., S.R., and A.R. were exhibiting extreme anxiety, depression and withdrawal, and the court did not believe the children were coerced, coached, or manipulated into testifying.

The final part of the section 388 analysis is whether there is clear and convincing evidence that the children's emotional health could be protected without removing physical custody from the father. The court noted the nature of the children's fears was essentially that they did not know how their father would react or what he would do. Part of the basis for their fear was the lack of privacy demonstrated by the father's recording of the therapy session; another part was the father's behavior while drinking.

With respect to the alcohol use, the court ordered SCRAM testing. With regard to privacy, that concern had been alleviated because the children were no longer participating in teletherapy at the father's home. Finally, the court found the father needed, "probably desperately, individual counseling to address anger management and impulse control, poor judgment issues, and I am ordering that, adding that to his case plan. Videotaping the kids' sessions, invading their privacy, violating a court order all indicate the dangerous lack of impulse control and poor . . . judgment."

The court indicated this was not the only evidence of poor judgment the father has demonstrated during the pendency of the case, which included, on one occasion, the father (who was represented by counsel) sending two e-mails directly to the court with copies to all counsel. Apparently the father was in a dispute with his lawyer on that occasion, because before the court was able to respond that the e-mail was inappropriate, the father's second e-mail appeared, saying that he had resolved his issue with his attorney and to please disregard the first e-mail.

This, the court indicated, showed "poor impulse control and poor judgment." The father, an experienced attorney, knew this conduct was "completely inappropriate. So that's a red flag to the court that there are impulse control problems

18

that merely amplify the impulse control problems exhibited by disregarding court orders, the Evidence Code, recognized privileged communications and the California Penal Code in taping sessions without permission."

The father, therefore, needed to understand the basis for his inability to make good decisions rather than impulsive and inappropriate ones, and the court expressed hope that counseling could get the father to that point.

In sum, the court found that while the children had demonstrated a change in circumstances and severe emotional damage, there were still reasonable means to prevent removal from the father, and it therefore denied the motion. The court was therefore adding those means in an attempt to avoid removal, but it was "probably a last-ditch effort and last-ditch means before removing." The court set a six-month review hearing for December 1, less than two months later.

Other discussions were held, but before the end of the hearing, the mother's counsel noted that the minors were very emotional and upset by the court's ruling on the section 388 petition. The court stated it understood. "I have to make decisions based on what I believe, based on the testimony, from the evidence is truly in the best interest of the children and often that's not necessarily what children think – even children of these kids' age think is in their best interest. And that's the reason why I made the orders that I have. [¶] If this isn't resolved, if this isn't fixed, if this doesn't become positive, I'm [] obviously, going to be forced to make other decisions, but if the children can visit and spend time – custodial time with father and not be afraid, have positive relationships and have a positive experience in the father's home, that is what is in their best interest. And I say that – I say if. That's what we're going to see. And I expect everyone to do their very best in order to make this successful. We'll see if it's possible."

The minors' counsel filed a notice of appeal from the order denying their July 2020 section 388 petition.

19

*November 3, 2020 Section 388 Petition*

Some six weeks later, on November 3, minors' counsel filed a second petition under section 388 asking the court to remove the father's custody of S.R., G.R., and A.R.  The petition alleged that the father had failed to have the SCRAM device installed for at least two weeks after the court's prior order and became intoxicated while the children were in his care.  The petition stated:  "The [children] repeatedly have stated that they feel unsafe in the care of the Father.  Since the last hearing, the Court promised the children they would be protected from Father's drinking and the associated concerns because Father would be on SCRAM.  As Father did not have the SCRAM applied and became intoxicated in their presence, the children have felt unsafe and unprotected by the Court in the Father's home.  Anxiety and stress have persisted."

The minors' counsel submitted a supporting declaration, offering factual information primarily on information and belief.  Those facts included that prior to October 27, the father had not had the SCRAM device installed.  During that visitation, the father appeared to be intoxicated as evidenced by slurred speech, half-closed eyes, using the children's full names, and appearing to be about to pass out.

The court ordered a hearing on whether the matter should proceed to an evidentiary hearing.  This hearing was conducted on November 6.  After hearing argument from counsel, the court indicated it was less concerned about the delay in installing the SCRAM device than the allegation that the father was intoxicated in the children's presence.  The court ultimately decided to set a full hearing on the petition on December 1, the same date as a contested six-month review hearing.

SSA filed a status review report prior to the hearings.  H.R. was doing well in the care of her mother.  She was participating in counseling with Tonkins and was taking medication to address depression and anxiety under the supervision of a psychiatrist.  She did not want to resume visitation with the father.

20

G.R., S.R., and A.R. had continued weekly therapy with Parker. SSA noted that "the children have stated and expressed concerns, uncomfortableness and anxiety during visits with their father. The children have described their worries when the father is alleged to be drinking and raising his voice." SSA's assessment stated the minors "have voice[d] their wishes to not have to visit their father as they stated feeling he will not change his behaviors or attitude which may consist of raising his voice or making them feel anxious of being blamed for doing something wrong while in his care." Although the minors appeared to be safe and well-cared for, they "continue to worry and suffer from anxiety as it pertains to the father's reports of alcohol use."

With regard to the father's progress with reunification objectives, SSA noted concerns have been reported regarding the father's anger and negative impulses towards the children. He needed to demonstrate ongoing acceptance and support for disclosures made by the children.

The father had a SCRAM device installed on October 27, with compliance monitored every half hour. He had also completed a parenting education program and an anger management class. Back in April 2020, the father had completed 16 sessions of therapy, and the therapist reported he had completed the following goals: "Establish and maintain a therapeutic alliance, discuss effective co-parenting skills and develop psychoeducation on parenting skills. It was reported the father was cooperative and engaged in therapy. The father was able to discuss ways he could co-parent so that the psychoeducational health of his children were maintained between visits. It was further noted the father was engaged in parenting topics and in sessions." In compliance with the court's order at the hearing on the first section 388 petition, another referral for individual counseling had been submitted.

SSA's recommendation was to maintain the status quo with regard to custody – H.R. with the mother, and G.R., S.R., and A.R. with both parents.

21

In an addendum report, SSA stated the father had not had any alerts on the SCRAM device since enrollment. G.R. and S.R., however, said that the father appeared to be drinking or drunk; G.R. was concerned the father could be drinking and "'getting away with it.'"

The hearing proceeded on December 3. S.R. testified about the weekend prior to the SCRAM device being installed. He believed his father was drunk because he seemed extremely tired, pale, and he was slurring his words. He feels scared and unsafe when his father is drunk because "I don't know if he's going to, like, lash out for no reason, or I don't know if something bad . . . like a fire happened, like if we needed help to get out of the house, he wouldn't be able to help us." He recalled telling the social worker that his father was drunk on that weekend.

After the SCRAM was installed, S.R. saw the father pour alcohol or vodka into a cup, but the father did not become drunk. He knew it was vodka because of the label and where the bottle was kept. S.R. did not see his father drink because he went upstairs right after he poured it.

S.R. did not want to continue to spend time with his father as he is now. He was nervous when he went to the father's house because after he saw the father drink alcohol with the SCRAM device on, S.R. thought the father had found a way to disable it. "If he gets drunk again, it's not going to be fun."

S.R. said he eats and sleeps "okay" at his father's house and was able to concentrate on schoolwork. He missed his mother and sister when he was at his father's house.

When S.R. told his mother about his belief that the father was drinking after the SCRAM device was installed, she asked if he wanted to tell his attorney. Before testifying, the mother reminded S.R. what he had told her about the father's drinking, but did not tell him what to say.

A.R. testified that after the last court date, but prior to the installation of the "bracelet" her father was now wearing, she thought her father was drinking. She thought he was drinking because "it was the last time he could," and because of the way her father was acting. He called G.R. by his full name, which he only does when he was drunk, his eyes were half-closed, and he was saying "nonsense" to the extent she could not understand what he was saying. She described the alcohol bottle but said she had not seen him drink from it that day. She felt scared because "I don't know what's going to happen. . . . I don't know if he's going to throw something. Not at me, but just like throw something 'cause he's drunk.'"

A.R. also saw her father drinking after he got the bracelet, although she did not recall the day. She saw him pour from a clear bottle into a red bottle then drink it. She testified "he pours the red stuff into it. I don't know what that is, but then pours the clear bottle into it too and he drinks it." She stated she saw this maybe three times after he got the bracelet.

G.R. also testified. As to the late October incident before the SCRAM device was installed, G.R. thought the father was drunk because he used G.R.'s full first name, which he never does otherwise. The father's eyes were not focusing on one thing, but moving around. His speech was slurred and his eyes looked half-closed as if he was trying to stay awake. These characteristics were common when the father was drunk. He told the social worker about his father's drinking that weekend.

After the SCRAM device was installed, G.R. saw the father take a sip of champagne on a Saturday in November. On another occasion, consistent with S.R.'s testimony, he saw the father pour vodka into a cup. He saw the father drink it. This made him feel "freaked out" because he knew the SCRAM device was installed and it was supposed to pick up consumption of alcohol. G.R. did not know if the SCRAM device was working or not, and he did not trust it.

23

Discussing his father's drinking made G.R. feel "[s]tressed out." He is scared to talk to his father about his drinking. When G.R. feels stressed, he loses his appetite. He did not report trouble focusing on his schoolwork.

The father testified, stating he did not recall the incident the weekend before the SCRAM device was installed, but later he stated he "certainly" had not consumed any alcohol while the children were in his care since the last court hearing. He denied drinking champagne after the SCRAM device was installed and stated it must have been sparkling apple cider that had been purchased for the minors. One of the minors, he testified, had seen him with club soda which they must have mistaken for alcohol. He said the red bottle A.R. referred to was pomegranate juice, which he sometimes mixed with alcohol, but after the SCRAM device was installed, he mixed it with club soda. He said A.R. was confused because "[s]he's nine."

Although he was aware of the children's testimony about their fear around him when he was drinking, the father stated that "[t]hey do not have fear about me drinking alcohol." He said the children's testimony was "not accurate." He did not state the children were lying, but that "they've been lead to a fear that doesn't exist and never did exist." Similarly, although he heard the children testify they are afraid to talk to him about his drinking, the father testified that is not an accurate statement of their feelings.

He denied ever being drunk around his children, which he defined as having consumed "so much alcohol that . . . it's impaired my ability to be [a] parent." Specifically, he testified that during the last two years, he had never been drunk in front of the children. The father stated the most he used to drink was one or two drinks after work at night, and the same amount on an average weekend. Since hearing the children's complaints about his alcohol use during the pendency of the proceedings, he stated he tried not to have anything to drink until they had gone to bed, or sometimes not at all.

The father was "positive" that his drinking habits had not negatively impacted his children. He believed this because his drinking habits had "not changed at

24

all" since he had children, and they only started complaining about anything related to alcohol once the case was filed. He denied tampering with the SCRAM device.[8]

The stepmother testified, and stated she had not seen the father drink alcohol during the weekend before the SCRAM device was installed or at any time in front of the children since the last hearing.

After argument by all counsel, the court ruled on the motion, finding the minors had failed to establish a change in circumstance. While the court did not disbelieve the minors' testimony, it found the evidence was "wholly insufficient" to establish that the father was drinking between the date of the prior court hearing and the date the SCRAM was installed. The signs seen by the children were for very short periods and that alone was insufficient. As to the incidents after the SCRAM device was installed, the evidence was also insufficient. While the court believed the children held the fear that the SCRAM was not protecting them, that fear was not based on any rational evidence or anything the father was doing.

The court noted: "It is clear to the court that the children have a legitimate and valid and real concern with regard to father's drinking. It is also obvious to the court that [the father] doesn't believe that. I guess that puts us in a difficult situation. I can only state in those plain and certain terms I believe that the children have a real legitimate concern with regard to [the father]'s drinking." This was a problem because if the father did not believe this, he was not going to be able to address it in any serious way, and it was one of the factors causing the children emotional harm.

The court also indicated it was not pleased that the mother had discussed the children's testimony with them, despite repeated orders not to talk about the case. However innocuous her intentions, she had violated those orders, and had created serious concerns about inappropriately coaching the children.

---

[8] During argument, County Counsel conceded there were methods to trick a SCRAM device.

The court also reminded both parents that the goal of dependency court was not to make each other "look as bad as possible." The court noted: "The reason that this case is in dependency court is because [of] the parents' inability to co-parent [and] to support each other . . . is causing emotional damage to the children. It is both parents' fault in not being able to get on pages where they can coexist and co-parent their children that [has resulted in this matter being] in dependency court and this case will never leave dependency court until the parents get to that point." The minors' counsel filed a notice of appeal from the court's ruling on the section 388 petition.

*Six-Month Review*

The six-month review hearing was trailed and held on December 8, 2020. The court incorporated all testimony from the hearing on the second 388 petition into the record. We need not go into great detail about the testimony offered at that hearing. The social worker testified in a manner consistent with SSA's reports. H.R. testified, asking for her conjoint therapy with the father to be terminated. She said that "nothing he's ever said sounds sincere." She did not want to see her father. The mother and Tonkins also testified.

During argument, county counsel indicated that SSA's recommendation was to keep the case open, and that it would be premature to close it as all options had not been exhausted. SSA opposed H.R.'s request to terminate conjoint therapy.

Minors' counsel asked the court to remove G.R., S.R., and A.R. from the father's custody. Counsel did not request to terminate H.R.'s conjoint therapy, but did ask the court to put it on hold while the father addressed his own issues.

The father's counsel requested an order to either have conjoint therapy with the other children or to close the case. Counsel argued the children are fine at their father's home and only raise issues outside the father's presence.

26

The court issued its decision on January 8, 2021.  Noting the goals of dependency, to protect the children and preserve the family as long as it can be done safely, the court found that grounds for jurisdiction still existed and denied the request to terminate jurisdiction.  Both parents, the court stated, were placing the children at risk of future harm.  "This case came into dependency court because of the parents' joint inability to cooperate with each other in coparenting their children.  Their collective inability to get along has caused and continues to cause their children to suffer serious emotional damage and to be at substantial risk of suffering serious emotional damage if supervision is withdrawn."

The court denied the minors' request to remove them from the father's custody, ruling the evidence was insufficient to support removal.  Pending the next hearing, the social worker was to visit each parents' home three times.  The court denied the order for all of the children to participate in conjoint therapy with H.R. and the father.  H.R.'s conjoint therapy was to continue.  The court ordered the parents to participate in conjoint counseling to focus on coparenting.  Custody, therefore, remained status quo, with H.R. with the mother and G.R., S.R., and A.R. splitting their time 50/50 between the parents.  The minors' counsel filed a notice of appeal from the rulings made at the six-month review hearing.  This court issued an order consolidating the three appeals.[9]

II

DISCUSSION

*Statutory Framework and Standard of Review*

The only issues in this appeal concern whether the court erred by failing to grant the minors' two section 388 petitions.  We review such a determination for abuse of

---

[9] See footnote 2 regarding the protective nature of this appeal.

27

discretion, and it is "rare" for the denial of a section 388 petition to warrant reversal. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 522.)

"'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.'" *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) ""'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.'"" (*Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1218.) ""'The discretion intended . . . is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion . . . but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.'" [Citation.] "'The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action. . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion.'"" (*Id.* at pp. 1218-1219.)

The factual underpinnings of the court's ruling are reviewed for substantial evidence. (*In re A.E.* (2014) 228 Cal.App.4th 820, 826.) ""'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"" (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) "[W]e do not pass on the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence. Instead, we review the record in the light most favorable to the juvenile court's order to decide whether substantial evidence supports the order." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146-147.)

In pertinent part, section 388, subdivision (a)(1), provides: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court

28

. . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order [the] court previously made . . . ."

Procedurally, the party "seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]' [Citations.] There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.] If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

In most situations, the party petitioning for a modification under section 388 must demonstrate they are entitled to that modification by a preponderance of the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) But if the relief sought is to remove a child from the parent's custody, a heightened standard applies: "If the request is for the removal of the child from the child's home, the petitioner must show by clear and convincing evidence that the grounds for removal in section 361(c) exist." (Cal. Rules of Court, rule 5.570(h)(1)(A).)

Section 361, subdivision (c), states, in relevant part: "A dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor . . . and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. [¶] (3) The minor is suffering severe emotional

29

damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent . . . ."

The court shall consider, as a reasonable means to protect the minor, the option of removing the offending parent from the home. (§ 361, subd. (c)(1).) The court may also consider the entire context of the case when considering a section 388 petition.

*July 2020 Petition*

As discussed at length above, the court, after hearing testimony on the minors' petition, found evidence of changed circumstances and clear and convincing evidence that G.R., S.R., and A.R. were suffering severe emotional damage. In deciding whether their emotional health could be protected without removal from the father's custody, the court looked at the reasons for their emotional problems, and identified both the privacy concern surrounding therapy and the father's behavior while drinking. The court found it could address the privacy concern by no longer holding teletherapy sessions at the father's home and the father's drinking with the use of a SCRAM device. The court also ordered further counseling for the father as to anger management and impulse control.

The minors contend that these alternative solutions to removal were simply not enough and did not address every aspect of the father's behavior; in their view, the only remedy was removal from the father's home. While they admit the SCRAM device, assuming it operated properly, may have been a justifiable alternative, they argue the recording of the therapy session and the father's drinking were not the minors' only "grievances." But as the minors admit, the SCRAM device was not the court's only order. The court also directed further counseling on anger management and impulse

30

control.  The minors argue that given the court's finding as to severe emotional damage, its alternatives were simply not "reasonable."

We disagree.  Section 361, subdivision (c), requires "no reasonable means" exist other than removal to protect the dependent child.  Here, in the context of a section 388 petition, we do not find it inherently unreasonable for a court to take steps to address the specific concerns raised by the minors with respect to the father's alcohol use, anger and poor judgment, and invasions of privacy.  Section 361, subdivision (c), requires the court to use steps less drastic than removal if they are available.  For example, such less drastic steps might include conditions of supervision or unannounced visits by SSA.  (See *In re Hailey T., supra,* 212 Cal.App.4th at p. 148.)  Here, they included additional counseling, a change of environment for teletherapy visits, and a SCRAM device to monitor the father's alcohol intake.  These steps were entirely reasonable as an alternate to the drastic remedy of removal, and we find no abuse of discretion.

*November 2020 Petition*

The minors' November 2020 section 388 petition was based entirely on the allegation that the father was drinking in the minors' presence after the previous hearing, both before and after the SCRAM device was installed.  After granting an evidentiary hearing and listening to evidence and argument, the court found the evidence the father was drinking was "wholly insufficient" to support a change in circumstances under the first prong of section 388.

The minors argue that the installation of the SCRAM device, alone, was enough to satisfy the requirement of a change in circumstances.  We disagree.  If that were the case, every time a parent began a new service, such as a parenting class or therapy, it would be enough to support a change in circumstances.  This is simply not the law.  Even the completion of a service may not be sufficient to demonstrate circumstances have changed.  (See *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

31

The court found that there was no alcohol seen or smelled, but the minors relied on their evidence of symptoms and other circumstances to support their belief that their father was drinking. But the purported symptoms were only observed for "a very short period of time and that's not enough to indicate that he was drinking after the court order . . . ." As to drinking after the SCRAM device was installed, the evidence of drinking was simply insufficient, particularly given the lack of any positive indications on the SCRAM. The court stated its belief that the children's fear that the father was drinking was not based on anything rational or anything the father was doing.

The minors make much of the court's statement at the prior section 388 hearing that installation of the SCRAM and the other actions taken by it were "probably a last-ditch effort and last-ditch means before removing." But this is not relevant when they failed to establish, by sufficient evidence, that the father had violated the court's order. These court's findings with respect to the second 388 petition were supported by sufficient evidence, and therefore, not an abuse of discretion.

*The Minors' Wishes*

In a separate section of their opening brief, the minors argue they have repeatedly stated that they no longer want to be in their father's custody, and the court should give more weight to their desires. They discuss Family Code section 3042, which directs a family court to give the wishes of a child of sufficient age and capacity "'due weight'" in custody orders. The minors also discuss the juvenile court's duty to consider the wishes of a child before rights are terminated. (§ 366.26, subd. (h).) Nonetheless, neither of those statutes apply to this situation.

The minors further argue they remain unprotected in light of the court's refusal to modify its prior order. They have not, however, demonstrated the court abused its discretion in denying their modification petitions, and without such a demonstration, no grounds for reversal exist.

We also note that throughout the case, the court has taken the minors seriously. Its decisions reflect careful attention to the minors' testimony and statements to the social workers and a clear understanding of their desires. The court is not short-changing their arguments or their feelings, but following the law, as it must.

*This Court's Duty to Report Attorney Misconduct*

We quoted at length above from the court's October 14 ruling with respect to the father recording at least one of S.R.'s therapy sessions with Parker. In sum, the court found sufficient evidence that the father intentionally took this action in violation of its prior orders. The court's finding is now final.

The California Rules of Professional Conduct, rule 8.4 states that "[i]t is professional misconduct for a lawyer to: . . . [¶] (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects; [¶] (c) engage in conduct involving dishonesty, fraud, deceit, or reckless or intentional misrepresentation; [¶] (d) engage in conduct that is prejudicial to the administration of justice . . . ." The comment section to rule 8.4 notes "A violation of this rule can occur when a lawyer is acting in propria persona or when a lawyer is not practicing law or acting in a professional capacity."

The father's decision to record his child's therapy session violated a prior court order. At a minimum, this conduct was dishonest and prejudicial to the administration of justice. It was also potentially criminal, as the court noted.

Canon 3D(2) of the California Code of Judicial Ethics states: "Whenever a judge has personal knowledge, or concludes in a judicial decision, that a lawyer has committed misconduct or has violated any provision of the Rules of Professional Conduct, the judge shall take appropriate corrective action, which may include reporting the violation to the appropriate authority."

The Advisory Committee Commentary to canon 3D(2) states: "Appropriate corrective action could include direct communication with the judge or lawyer who has committed the violation, writing about the misconduct in a judicial decision, or other direct action, such as a confidential referral to a judicial or lawyer assistance program, or a report of the violation to the presiding judge, appropriate authority, or other agency or body."

The judge presiding below took the following steps: discussing the father's conduct at length on the record, warning him against future similar conduct, and removing his ability to repeat the particular conduct at issue. These steps included, therefore, "direct communication with the . . . lawyer who has committed the violation," and "other direct action." We deem the trial judge's measures to be "appropriate corrective action" under the California Code of Judicial Ethics canon 3D(2). The trial judge did not initiate contempt proceedings, nor, to the best of our knowledge, did the trial judge report the father to the State Bar of California.

Our duty to follow the Code of Judicial Ethics, however, is separate and independent from the trial judge's duty. We have taken the additional step of writing about the father's violation in this opinion as further corrective action, but we have decided not to report his conduct to the State Bar at this time.

Nonetheless, we caution the father in the *strongest possible terms* that further violations of court orders, the law, or any conduct involving dishonesty or prejudice to the administration of justice reflected in the record of a future appeal or writ in this matter will not be tolerated by this court. It should go without saying that we take such conduct extremely seriously.

As a lawyer, the father's professional duties extend beyond his representation of clients and into his personal life, including the way he conducts himself as a party to these proceedings. He has education, he has experience, and he has a professional duty to hold himself to the highest standards of honesty, abiding by the law

34

and the court's orders, and engaging only in conduct that serves the administration of justice rather than prejudicing it.  If the father's future behavior does not reflect these values, we will not hesitate to report his conduct to the State Bar as a potential violation of the California Rules of Professional Conduct, rule 8.4.

## III
## DISPOSITION

The orders are affirmed.

MOORE, ACTING P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.